DECISION
Relator, Shawn W. Crossan, has filed this original action in mandamus requesting this court to issue a writ of mandamus ordering respondent Industrial Commission of Ohio to vacate its order denying additional compensation based on the employer's violation of a specific safety requirement ("VSSR") and to enter a new order that grants said compensation, or, in the alternative, an order that complies with applicable law.
This court referred the matter to a magistrate, pursuant to Civ.R. 53(C) and Loc.R. 12(M) of the Tenth District Court of Appeals, who issued a decision, including findings of fact and conclusions of law. (Attached as Appendix A.) The magistrate concluded that relator had failed to demonstrate that respondent-commission had abused its discretion and that this court should deny the requested writ.
No objections have been filed to the decision of the magistrate.
Finding no error or other defect on the face of the decision of the magistrate, pursuant to Civ.R. 53, we adopt the decision of the magistrate as our own, including the findings of fact and conclusions of law contained in it. In accordance with the decision of the magistrate, the requested writ is denied.
Writ of mandamus denied.
BOWMAN and DESHLER, JJ., concur.
 APPENDIX A IN MANDAMUS
Relator, Shawn W. Crossan, filed this original action asking the court to compel respondent Industrial Commission of Ohio to vacate its order denying additional compensation based on the employer's violation of a specific safety requirement ("VSSR") and to issue an order that grants compensation, or, in the alternative, an order that complies with applicable law.
Findings of Fact:
1. In June 1994, Shawn W. Crossan ("claimant") was hired by Cleveland Letter Service, Inc., as a printer press operator. His primary job was to operate the ATF Chief Model 217 Two-Color Duplicator, a printing press standing about waist high and approximately six feet long. It was equipped with ink rollers, water rollers, and impression cylinders. The paper stock was loaded between guides, after which the stock moved into the machine via various grippers and bars, was then conveyed through the impressions phase, and then transferred to delivery grippers, which put the printed material into a pile. The machine had hinged covers, which could be opened when adjustments or repairs were needed.
2. There were numerous knobs and levers for adjusting the printing press operations. For example, the tension on guides and grippers could be tightened or loosened. Rollers could be adjusted vertically and/or laterally. Impressions could be heavier or lighter. If an image was too high or low, too far left or right, too light or dark, too damp or too dry, or crooked, there were numerous adjustments that could be made to feeders, bars, pumps, grippers, rollers, cylinders and guides. To make many of these adjustments, or to remove jammed paper, the operator needed to reach into the printer, which could involve opening one of the covers.
3. The Model 217 printing press has an on/off switch for the drive motor, located at the top of the machine, near the middle. One of the covers, at the delivery section of the machine, has a mechanism that turns the motor off when the cover is raised. However, there was evidence that this automatic turn-off mechanism was not present on the subject printer. In addition, the printing press has a large power cord that can be unplugged. In the operating manual, this caution appears repeatedly:
"REMOVE POWER CORD PLUG FROM POWER RECEPTACLE BEFORE CLEANING OR MAKING ANY INSIDE ADJUSTMENTS. MAKE SURE DRIVE MOTOR AND PUMP SWITCHES ARE IN THE "OFF" POSITION BEFORE REPLACING POWER PLUG."
4. On January 18, 1995, claimant was performing his usual duties. He needed to make adjustments for the thickness of the paper, which was an ordinary and frequent activity.
5. Claimant stated that, prior to making the adjustments, he switched off the motor using the on/off switch. He states that he did not unplug the power cord.
6. Claimant stated that, while he was making the adjustment, the motor suddenly turned on by itself, which had never happened before. His right forearm was caught and pulled into the machine. He said he always turned off the machine before adjusting it and that it never before turned on again until he switched it on.
7. Claimant testified that, when his arm became lodged in the printing press, it stopped. He then used his other hand to pry apart the mechanism enough to remove his arm. He then went to see the production manager, who drove him to the hospital. There were no witnesses to the accident.
8. Claimant's workers' compensation claim was allowed for injuries to the left wrist and hand.
9. In January 1997, claimant filed a VSSR application, alleging "no safety guards, disengagement switches disconnected and possible short circuit in electrical system."
10. The Bureau of Workers' Compensation conducted an investigation, and its report is included in the record.
11. In his affidavit, claimant stated, inter alia, that he was hired because he was experienced with the Chief Model 117 Duplicator. As to the accident, he stated:
"* * * I was in the process of making adjustments on the chain delivery when the press came on and grabbed my arm and pulled it back towards the cylinder. My arm became wedged in the grippers and the powder spray unit. My arm stopped the press and then I was able to pry the chains apart and remove my arm. I could not reach the on/off switch * * *." He asserted that the injuries would not have occurred if the safety cover had been in place that turned the machine off when the cover was lifted, or if there had been a cover over the chain delivery system.
12. In his affidavit, the production manager, Dennis Bruening stated:
"* * * As part of the machine assembly, there are `gripper bars' that pull the paper through the printing press on which text and/or images are printed. Upon occasion, the gripper bars require adjustment to accommodate the thickness of the paper stock being run through the printing press." Mr. Bruening stated that all operators were instructed and warned never to adjust gripper bars without first unplugging the press from the power source. Mr. Bruening confirmed that the power cord was still plugged in when claimant was injured, and that he had never heard of the machine turning itself back on. He stated that, after the accident, claimant explained that he was adjusting the gripper bar from the bottom of the press. Mr. Bruening opined that the injury would not have occurred if claimant had unplugged the press before adjusting the gripper bar or if he had adjusted the gripper bar at the delivery end of the machine instead of from the bottom, as claimant described.
13. At the VSSR hearing, claimant amended his application to allege violation of Ohio Adm. Code 4121:1-5-05(C)(4). He testified in detail regarding the accident, reiterating that he shut off the machine. He testified that it came back on for unknown reasons, which had never happened before. After the hearing, the commission denied the application:
"* * * [T]he claimant has not persuasively demonstrated that the employer violated a specific safety requirement; and that such viola tion was the proximate cause of the industrial injury.
"* * *
"* * * [In] the VSSR Application, the claimant indicated that the employer violated specific safety requirements which cause the claimant to sustain his injury as follows: `no safety guards, disengagement switches disconnected and possible short circuit in electrical system.'
"In his VSSR Application, the claimant initially alleged a violation of O.A.C. 4121:1-5-5(D)(1)(A)(B).
"At hearing, claimant's counsel clarified that citation to state that he actually meant the specific safety requirement violated was O.A.C.4121:1-5-05 (D)(1). That specific safety requirement provides in relevant part `means shall be provided at each machine, within easy reach of the operator, for disengaging it from its power supply.'
"The Staff Hearing Officer finds that the claimant has not sustained his burden of establishing that the particular specific safety requirement was violated by the employer. The claimant's own transcript testimony at hearing indicated that there was an on/off button directly in fron[t] of him while he would be operating the machine. The claimant repeatedly indicated in the hearing transcript that he had in fact turned the machine to the off position prior to going down to make adjustments at the end of the * * * printing machine that was involved in the named accident. By the claimant's own transcript testimony at hearing, the machine was in fact in the off position while the claimant went down to the end of the machine to make adjustments.
"The testimony of the claimant at hearing was that even though the machine was in the off position while he was working on it, that the machine mysteriously turned itself back on while he was reaching into the machine. The claimant was not sure why the machine malfunctioned in that manner, and he indicated that that had not occurred before while he was operating the machine. (See transcript pages 20, 59-60, 60-61, 41-42).
"Based on the above, the Staff Hearing Officer concludes that a means had been provided at the machine for disengaging it from its power supply. That button was directly in front of the claimant, and in fact the claimant had used that button for turning off the machine and disengaging it from its power supply prior to going and working down at the end of the machine.
"Apparently the machine turned itself back on, causing the injuries of record. However, since both the claimant and his supervisor Mr. Bruening at hearing testified that such a malfunction had never previously occurred on that machine, the Staff Hearing Officer finds that there is no violation for a one time malfunction of the safety equipment when such is not foreseeable, pursuant to the Supreme Court Case of M.T.D. Products v. Stebbins (1975), 43 Ohio St.2d 114.
"At hearing, the claimant orally amended his Application for VSSR to include an allegation that the employer violated O.A.C. 4121:1-5-05(C)(4).
"* * *
"Even though the Staff Hearing Officer has permitted the oral amendment of the VSSR Application at hearing, the Staff Hearing Officer nevertheless finds that the claimant has not persuasively established that the employer violated the newly amended section; nor that such violation was the proximate cause of the allowed industrial injury. This newly amended alleged violation was argued on the merits extensively at hearing. The claimant describes in great detail beginning on page 81 of the hearing transcript as to precisely how he was injured. The testimony established that the claimant did not get his arm caught in the pinch point between the chain conveyer and the take-up pulley; nor did he get his arm caught where the conveyer belt traveled over the sprocket wheels of the machine. The Staff Hearing Officer concludes that these would be the pinch points that are required by the safety code to be guarded.
"The claimant testified that his arm was caught by cam bars and gripper bars. These bars were located between the sprockets and between the chain conveyers.
"Claimant and his counsel at hearing advanced the theory that since the cam bars and the gripper bars were attached to the sprockets and the chain drive, that they were required to be guarded as well as the pinch points occurring where the conveyer belt or chain drive travels over the sprocket wheels or take-up pulleys of the chain conveyer. The Staff Hearing Officer finds this to be a matter of interpretation of the specific safety requirement; and that reasonable minds could conclude that different applications apply. As such, the specific safety requirement must be construed strictly in favor of the employer, since the purpose of the VSSR Award is to be in the nature of a penalty against the employer.
"Since the Staff Hearing Officer concludes that the claimant did not catch his arm in a pinch point which would be created by the conveyer belt or chain conveyer running over the sprocket wheels of the machine, the Staff Hearing Officer concludes that the lack of a guard over that particular pinch point was not the proximate cause of the industrial injury. Further, the Staff Hearing Officer declines to apply these specific safety requirement so broadly as to accommodate claimant's argument that any portion of a machine connected to a conveyer belt or chain conveyer drive must be required to be guarded by the employer. Likewise, the fact that the claimant's arm was not injured by being caught in the pinch point between a conveyer belt or chain drive running over a sprocket wheel, the fact that the employer did not provide a means at that pinch point to disengage the belt or chain from the source of power is likewise found not to be the proximate cause of the allowed industrial injury.
"Based upon the above reasoning, and based upon a careful page-by-page review of the entire claim file including the hearing transcript, the Staff Hearing Officer concludes that the claimant has not met his burden of establishing that the employer violated a cited specific safety requirement; or that such violation was the proximate cause of the allowed industrial injury."
14. Claimant sought rehearing, which was denied in a lengthy order, including the following:
"* * *
"The Hearing Officer stated that based on claimant's testimony the claimant didn't get his arm caught in a pinch point between the chain conveyor and the take up pulley, and his arm wasn't caught where the conveyor belt traveled over the sprocket wheels of the machine. The Hearing Officer found the claimant's arm was caught by cam bars and gripper bars that are located between the sprockets and between the chain conveyors. The Hearing Officer went on to then find that using a strict interpretation of this rule as required in VSSR cases that guarding would not apply to these cam and gripper bars as those parts are only connected to a conveyor belt or a chain conveyor drive.
"The claimant disputes that finding stating that claimant's testimony indicated his arm was pulled into the machine by a chain drive.
"A review of the transcript on file indicates that the area the claimant's arm was caught on is a disputed question in terms of being caught in a pinch point created by a conveyor belt or a chain conveyor running over the sprocket wheels of the machine or a part attached thereto. Because this issue is clearly a disputed factual question giving rise to various interpretations based on the transcript testimony, it is not found that the ruling by the Hearing Officer that area where claimant's arm was caught doesn't fit within the standards of rule 4121:1-5-05(C)(4) can be considered an obvious mistake of fact."
Conclusions of Law:
Claimant argues that the commission abused its discretion in denying his VSSR application. The applicable law is set forth in numerous judicial decisions, including State ex rel. Buehler Food Markets, Inc. v. Indus. Comm. (1980), 64 Ohio St.2d 16; State ex rel. Cotterman v. St. Marys Foundry (1989),46 Ohio St.3d 42; and State ex rel. Watson v. Indus. Comm. (1986), 29 Ohio App.3d 354. In brief, the claimant has the burden of establishing that the specific safety requirement was applicable, that the employer violated it, and that the violation was the cause of the occupational illness or injury. State ex rel. Commercial Lovelace Motor Freight, Inc. v. Lancaster (1986), 22 Ohio St.3d 191, 193. Because a VSSR award is punitive, the specific safety requirement must be construed in favor of the employer. State ex rel. Burton v. In dus. Comm. (1989), 46 Ohio St.3d 170.
At hearing, relator's counsel explained that he meant to cite Ohio Adm. Code 4121:1-5-05(D)(1), which provides as follows:
"Means shall be provided at each machine, within easy reach of the operator, for disengaging it from its power supply. * * *" In addition, claimant amended the application to cite Ohio Adm. Code 4121:1-5-05(C)(4), which requires that "* * * [p]inch points created by travel of conveyor belts over or around end, drive, and snubber, or take-up pulleys of chain conveyers running over sprocket wheels shall be guarded or a means shall be provided at the pinch point to disengage the belt or chain from the source of power." The commission found that neither of these safety requirements was violated.
In regard to division (D)(1), the commission found that means were provided at the machine, within easy reach of the operator, to disengage it from its power supply. This finding was supported by some evidence. Not only was there evidence of an on/off switch at the operator's usual position when the machine was operating and printing, but claimant stated that he used the switch successfully to shut down the machine before he reached into the area where the adjustment was needed.
To the extent that claimant argues that there should have been emergency shut-off buttons at both ends of the printer and on the sides, the magistrate notes that the evidence does not establish that an emergency shut-off button would have prevented or minimized claimant's injuries. First, he testified that the printer stopped by itself when his arm was lodged in the printer. Second, given that his right hand was unexpectedly pulled a short distance into the machine, it is speculative whether claimant could instantly have used his left hand to stop the printer before any injury occurred. Although there are many cases in which an emergency shut-off can prevent or minimize injury, claimant has not presented evidence in this case that an emergency shut-off button would have prevented or minimized his injury.
Claimant also argues that the machine should have had an automatic shut-off cover, to turn off the machine whenever the worker lifted the cover to make an adjustment. However, that argument fails here. The worker states that he did shut off the machine, manually, before commencing his adjustment. Therefore, a mechanism that would automatically shut off the machine when the cover was lifted would not have prevented this accident, which was not caused by a lack of shutting the machine off in the first place.
Also, this is not a case where the absence of an automatic shut-off permitted the worker to leave the machine running while opening a cover and reaching inside. Rather, claimant states that the printer was shut off. Claimant has not demonstrated that a second means of shutting off the printer would have prevented the injury.
Next, the commission found that claimant did not injure himself on a pinch point created by the travel of a conveyor belt or a pinch point created by take-up pulleys of a chain conveyer running over sprocket wheels. The evidence before the commission included evidence of the machine's parts and its mechanical operations, as well as claimant's testimony as to how the incident occurred. The magistrate concludes that the evidence was susceptible to interpretation by the finder of fact.
The commission provided a detailed description of its analysis of how the mechanism worked and how it caught claimant's arm, and the magistrate concludes that this analysis constitutes a reasonable interpretation of the evidence that was within the commission's discretion as the sole finder of fact. Further, the magistrate finds that claimant has not demonstrated a misapprehension of the applicable law by the commission. Accordingly, claimant has not met his burden of proving an abuse of discretion by the commission. In short, claimant has not demonstrated that the commission had a legal duty to grant his VSSR application.
The magistrate therefore recommends that the requested writ of mandamus be denied.